UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
PRUDENTIAL EQUITY GROUP, LLC         :
                                     :
                 Plaintiff,          :
                                     :
        v.                           :   07 CV 5606 (JSR)
                                     :
THOMAS R. AJAMIE, AJAMIE LLP, ROBERT :
WEISS, ROBERT H. WEISS & ASSOCIATES, :   **DECLARATION OF**
LLP, JOHN MOSCOW, ROSNER NAPIERALA,  :   **DAVID A. PICON**
LLP, BRIAN ROSNER, DAVID ROBBINS,    :
KAUFMANN FEINDER YAMIN GILDIN &      :
ROBBINS, LLP, WALLACE SHOWMAN,       :
BERNSTEIN LITOWITZ BERGER &          :
GROSSMANN LLP, ROBERT KRAUS, KRAUS   :
& ZUCHLEWSKI LLP, MARTIN KROLL and   :
KROLL, MOSS & KROLL LLP              :
                                     :
                 Defendants.         :
------------------------------------X

DAVID A. PICON hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am a member of Proskauer Rose LLP, counsel for Plaintiff Prudential Equity Group, LLC ("PEG") in the above-captioned matter. I submit this declaration in support of PEG's application for an award of attorneys' fees, costs and disbursements in the aggregate amount of $69,439.74, all of which were incurred in connection with the commencement and prosecution of this interpleader action, pursuant to 28 U.S.C. § 1335.

**OVERVIEW**

2. As explained below, although PEG sought to effect an expedited and orderly divestment of the substantial fund it held – approximately $4.5 million – two of the claimants, Thomas Ajamie and his law firm, Ajamie LLP (collectively, "Ajamie"), took steps to stymie

those efforts, including by seeking and obtaining *ex parte* injunctive relief against PEG in a Texas state court, the intent of which was to preclude PEG from bringing this proceeding.

3.    As a result of Ajamie's gamesmanship, PEG, which ultimately obtained dissolution of the improper order that had been granted against it, was required to retain Texas counsel, Bracewell & Giuliani LLP, and to incur substantial additional costs just so that it could commence this proceeding. Indeed, of the $69,439.74 in attorneys' fees and costs incurred by PEG in connection with the commencement and prosecution of this proceeding, approximately $56,410.50 (or over 80%) was incurred *after* Ajamie filed his ill-advised Texas application.

4.    Stated simply, although reasonable in light of the complexity of the matter and the nature of the services performed, and although modest in terms of the size of the stake (*i.e.*, approximately 1.5%), but for the actions of one of the claimants here – Ajamie – the fees, costs and disbursements sought by PEG here could have been substantially less.

## BACKGROUND

### The Nature of the Disputed Fund

5.    In this action, PEG has interpleaded $4,482,944.88, the total amount due and owing by PEG pursuant to that portion of an arbitration award issued by the New York Stock Exchange claimed to be attributable to attorneys' fees (hereafter, the "Disputed Fund"). As explained below, PEG proceeded by statutory interpleader because it was faced with numerous competing – and potentially conflicting – claims to all or part of the Disputed Fund. As the Court recognized in its June 27 Order releasing PEG from all further liability with respect to the Disputed Fund, PEG itself has no interest in the Disputed Fund and was merely a stakeholder.

2

6.  Although a more complete statement of the relevant procedural history is contained in the June 12, 2007 declaration of my colleague, Karen Coombs, submitted in support of PEG's Order to Show Cause, I will briefly describe the background that led to this proceeding.

7.  On May 18, 2006, a panel of the New York Stock Exchange issued a monetary award against PEG in the amount of $11,830,516.00, plus interest (the "Award").[1] Following cross-motions to confirm and vacate the Award, on February 20, 2007, an Order was entered in the Supreme Court, New York County, confirming the Award. PEG subsequently paid to the arbitration claimants the full amount to which they were entitled under the Award – $10,460,204.73.

8.  A significant portion of the Award – that is, the more than $4 million attributable to attorneys' fees – continued to be the subject of competing claims. In fact, even before the filing of the cross-petitions to confirm and vacate the Award, PEG was notified, by letter dated July 30, 2006, that defendant Robert Weiss and/or his law firm, defendant Robert Weiss and Associates, P.C. (collectively, "Weiss") purported to assert a charging lien for legal fees against any monetary award that was rendered in favor of the arbitration claimants.

9.  As detailed in the Coombs Declaration, PEG spent substantial time attempting (without success) to receive adequate assurances from Weiss and the other defendants who then asserted a claim to the Disputed Fund to ensure that PEG would not subject itself to duplicative claims or put itself at risk of liability by paying out the more than $4 million attributable to attorneys' fees that it continued to hold. (Notably, the attorneys' fees that PEG incurred as a result of those extensive discussions and negotiations with the various defendants or their

---

[1] PEG subsequently reached agreement with the claimants that the running of interest would cease, and the parties agreed that the total amount due under the Award was fixed at $14,943,149.61.

3

counsel, as well as the preparation of agreements and proposed agreements with respect to same, are *not* part of the attorneys' fees being requested here.)

10. Ultimately, on or about March 28, 2007, all defendants who had then been identified or made themselves known to PEG as potentially having a claim to any part of the Disputed Fund agreed in writing that PEG would continue to hold the Disputed Fund, pending *joint instruction* from those defendants with respect to its disposition. Among other things, that agreement gave PEG the right, but not the obligation, to take steps to obtain a Court order to deposit the Disputed Fund with the Court if such joint instruction was not forthcoming before March 29, 2007.

## PEG Prepares an Initial Interpleader Action

11. PEG did not receive the contemplated joint instruction regarding the Disputed Fund. Unbeknownst to PEG, prior to May 2007 (the time at which PEG started to incur the fees at issue here), defendants Ajamie and Weiss had each filed state court actions against one another with respect to the Disputed Fund – Ajamie by a complaint filed in Harris County, Texas in January 2007, and Weiss' in New York Supreme Court in April 2007.

12. Also unbeknownst to PEG, defendant Ajamie, on or about March 28, 2007 – the same date on which he had agreed to PEG's continuing to hold the Disputed Fund – filed a Second Amended Petition in his pending action in Texas, naming PEG as an additional defendant, and seeking, *inter alia*, to compel PEG to place the Disputed Fund into the Court registry in Harris County, Texas. Ajamie neither served this pleading on PEG nor advised PEG of its existence. Instead, PEG only learned about the Texas action and its being a named (but unserved) defendant in that action when, in May 2007, it discovered and reviewed the complaint

4

that Weiss had filed against Ajamie in New York, which pleading referenced Ajamie's pre-existing Texas lawsuit.

13.     Neither the action filed by Ajamie, nor the one filed by Weiss, included all of the defendants to the present action who have made or may make claims with respect to the Disputed Fund.

14.     In or about May 2007, PEG also learned of two new potential claimants to the Disputed Fund – defendants Brian Rosner and Rosner & Napierala, LLP. At that time, I was advised by Matthew Farley of Drinker Biddle, LLP, the law firm that represented PEG in the underlying arbitration proceeding, that he had received a call from Rosner, who identified himself as a member of defendant Rosner & Napierala, LLP and who stated that his former partner, defendant John Moscow, had performed work on the arbitration while employed as a contract partner at Rosner & Napierala. Accordingly, Rosner claimed that Moscow's so-called claim to the Disputed Fund was, in actuality, one that belonged to him and/or his firm.

15.     In light of its learning about the competing litigations, neither of which included all potential claimants to the Disputed Fund, and, in particular, in light of the appearance of yet more potential claimants, PEG determined to exercise the right it had reserved to take steps to place the Disputed Fund in court. Accordingly, PEG began to ensure that it was aware of all proper defendants, and to conduct research necessary in light of the issues relevant to an interpleader action (*e.g.*, potential forums, equity v. statutory interpleader) and to prepare a complaint for interpleader and ancillary documentation.

16.     In an effort to proceed consensually, on May 25, 2007, I wrote to Ajamie's and Weiss' counsel in their respective actions to advise them that PEG was concerned that neither proceeding included all potential claimants to the Disputed Fund, and thus, the proceedings

could potentially result in PEG facing successive, duplicative, or inconsistent directions with respect to the Disputed Fund. Accordingly, I advised these defendants that PEG would give them until the middle of the following week to work out their jurisdictional disputes and join all potential claimants in a single action. If defendants did not do so by then, I advised them that PEG intended to commence an interpleader action with respect to the Disputed Fund in this Court.

### PEG Incurs Additional Fees as a Result of Ajamie's Actions in Texas State Court

17. Rather than respond to PEG's approach in a manner that would have allowed an orderly and expedited divestment of the Disputed Fund, after numerous conference calls with Ajamie's counsel – and just hours before PEG had indicated it would file its Interpleader Complaint – Ajamie, moving *ex parte*, sought and obtained a temporary restraining order in Harris County, Texas, to prevent PEG from exercising that right.

18. More specifically, Ajamie's TRO prevented PEG "from interpleading in any court, save and except the registry of this Court [*i.e.*, Harris County], any and all funds held by it that are attributable to the award . . ." In that same order, Ajamie further sought a mandatory injunction ordering PEG to deposit the Disputed Fund in Harris County's Court registry in a hearing to be held the following week. A copy of that TRO is annexed as Exhibit B to this Declaration.

19. As a result of Ajamie's tactical maneuvering, PEG was required to retain counsel in Texas to respond to the temporary restraining order. Naturally, Ms. Coombs and I needed to work closely with PEG's Texas counsel so as to provide them with the necessary background and documentation to successfully respond to the *ex parte* order.

6

20. After substantial proceedings in Texas, including two separate hearings, on June 11, 2007, the Harris County Court dissolved the temporary restraining order that had been granted to Ajamie. As a result of the dissolution of the TRO, the Texas Order was no longer a factor regarding the filing of an Interpleader Complaint in this Court.

### PEG Files Its Interpleader Action, Together with A Necessary Order to Show Cause

21. Thereafter, notwithstanding threats from Ajamie's counsel that his client would bring claims against PEG were it to file an interpleader action in this Court, PEG filed the present action on June 12, 2007, the day after the Texas Order was issued. In light of the previous actions by Ajamie, including, but not limited to his concealment of the Texas action in which he sued PEG, as well as Ajamie's counsel's statements to PEG's Texas counsel that he would amend his complaint in Texas to sue PEG for conversion and breach of contract if PEG commenced the interpleader action in this Court, PEG believed it necessary to move by Order to Show Cause for temporary and permanent relief enjoining the filing or maintenance of any suits against it with respect to the Disputed Fund.

22. Accordingly, in addition to its complaint, PEG prepared and filed an Order to Show Cause, together with an extensive supporting declaration and a memorandum of law. PEG's TRO was granted by this Court on June 12, 2007, and the Order to Show Cause and supporting papers were served on all parties.

23. Thereafter, on June 25, 2007 (after an adjournment requested by Ajamie), all parties appeared before the Court. Despite Ajamie's refusal to consent to PEG's proposed interpleader a month earlier, at that hearing, no defendant, including Ajamie, raised any objection to PEG's proposed relief, effectively conceding that interpleader was the necessary action to take with respect to the Disputed Fund.

## THE FEE APPLICATION

24.  Where, as here, an innocent and otherwise disinterested stakeholder has expended time and money on an interpleader action, that stakeholder's attorneys' fees and costs associated with such action are generally awarded. *See, e.g., Septembertide Publ'g, B.V. v. Stein and Day, Inc*, 884 F.2d 675, 683 (2d Cir. 1989); *Locals 40, 361 & 417 Pension Fund v. McInerney*, 2007 WL 80868, *5 (S.D.N.Y. Jan. 9, 2007); *Fidelity Brokerage Servs., LLC v. Bank of China*, 192 F. Supp. 2d 173, 183 (S.D.N.Y. 2002). The costs and fees are generally awarded against the interpleaded fund, but the court has discretion to tax such fees against one of the parties when that party's conduct justifies it. *Septembertide*, 884 F.2d at 683.

25.  This Court has discretion to determine the appropriate amount of fees and expenses. *Algemene Bank Nederland, N.V. v. Soysen Tarim Urunleri dis Ticaret ve Sanayi*, 748 F. Supp. 177, 183-84 (S.D.N.Y. 1990). Among the relevant factors in making this determination are: the complexity of the action; the good faith and diligence of the stakeholder; and whether the claimants improperly protracted the proceedings. 7 Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1719 (3d ed. 2001). The Court may also consider whether the proposed hourly rates charged by the attorneys are commensurate with rates in the prevailing legal community. *Landmark Chemicals, S.A. v. Merrill Lynch & Co.*, 234 F.R.D. 62, 64 (S.D.N.Y. 2005) (finding hourly rates of $285-$590 per hour reasonable some years ago in attorneys' fees application by stakeholder in interpleader action, but determining that 250 hours in billable time was "somewhat excessive").

26.  Finally, courts in this district have sometimes considered the reasonableness of an interpleader fee application by considering the fees in comparison to the total amount of the interpleaded fund. Thus, for example, in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v.*

8

*Clemente*, 2001 WL 536929 (S.D.N.Y. May 21, 2001), the court awarded the stakeholder fees in the amount of $263,963.63, which amounted to approximately one percent of the total fund at issue in that case. *See Estate of Ellington v. EMI Music Publig.*, 282 F. Supp. 2d 192, 195 (S.D.N.Y. 2003) (referencing the reasonableness of the *Merrill Lynch* fees as a percentage of the total fund).

27. As explained below and reflected in the annexed exhibits, all of the fees, costs and disbursements for which PEG seeks reimbursement were directly related to its efforts to interplead the Disputed Fund in an action that joined all potential claimants and discharged PEG from any further liability with respect to the Disputed Fund.

28. The legal fees incurred by PEG essentially fall into three separate categories: (a) those incurred in connection with PEG's initial efforts to commence this proceeding; (b) those incurred in connection with addressing the *ex parte* TRO obtained by Ajamie in Texas; and (c) those incurred after the dissolution of the Texas order and in connection with the filing of this action, together with an Order to Show Cause seeking injunctive relief against all of the parties.[2]

29. With respect to the first category of fees, Proskauer was required to research available interpleader options, including a comparative analysis of the merits of proceeding in state or federal court, and by rule or statutory interpleader, as well as to consider potential jurisdictional issues with respect to the multiple defendants PEG needed to include in its planned interpleader action. The results of this research were the subject of internal conferences and conferences with the client.

---

[2] Attached as Exhibit A is a pro-forma billing statement, prepared for the purposes of this application, which reflects the time entries of the Proskauer attorneys and the disbursements and costs related to this matter for which PEG seeks to recover. For purposes of this application, we have grouped these time entries into the three separate categories referenced above. Further, in compiling these fees, costs and disbursements, I have reduced attorney time charges to eliminate any possible duplication.

30. Proskauer further expended time in this first phase preparing its interpleader complaint and related documents necessary to initiate the action. PEG had significant concerns that, even after depositing the entire amount of the Disputed Fund with this Court, one or more of the claimants (*i.e.*, Ajamie or Weiss) might seek to compel delivery of another $4 million, into another proceeding brought by them. Accordingly, PEG also researched and began to prepare a potential order to show cause which would have *ordered* PEG to deposit the Disputed Fund in this Court, in order to protect PEG from such a duplicative claim. Further, in its efforts to proceed consensually with this action, PEG incurred attorneys' fees and costs related to numerous telephone calls with Ajamie's counsel, and preparation of the letter I sent to counsel for Ajamie and Weiss seeking their consent. Proskauer's fees and related disbursements for this first phase amounted to $15,887.00.[3]

31. As for the second category of fees, Proskauer was required to review and analyze the validity of the *ex parte* TRO Ajamie had obtained, including analyses of the validity of Ajamie's action, jurisdictional considerations, and the enforceability of the TRO as it related to PEG's planned filing of an interpleader action. Proskauer also expended significant time discussing these issues with PEG's Texas counsel, Bracewell & Giuliani, LLP, and bringing them "up to speed" on the procedural history of this action (including through preparation of an annotated time line). In addition to fees incurred as a result of Proskauer's work, PEG incurred fees and expenses from Bracewell & Giuliani, LLP, which was required to quickly learn the details of the Disputed Fund, the parties' prior agreements with respect to the Disputed Fund, and whether Ajamie's present conduct violated those agreements, which indeed it did.

---

[3] This amount reflects a writeoff in the amount of $3698.50 which Proskauer deducted from the bill to PEG for its May time. Although not all of the time spent that month related to the interpleader action, in an effort to be conservative, PEG has applied the entire writeoff to these fees, rather than reduce the fees attributable to interpleader by a proportional amount.

10

Bracewell & Giuliani prepared and argued a motion to dissolve the TRO, as well as a motion to reargue when its initial application was denied. (The July 2 Declaration of Christina Ponig, Esq. of Bracewell & Giuliani, submitted herewith, more specifically describes the work performed by that firm on PEG's behalf.) Proskauer's and Bracewell & Giuliani's fees and disbursements for this second phase amount to $13,062.50 and $25,052.50, respectively.

32. Finally, as for the third category of fees, Proskauer was required to revise its previously-drafted interpleader complaint so as to include the events in the Texas proceeding, including the dissolution of the TRO. Further, in light of Ajamie's obtaining of an *ex parte* TRO in the Texas action and his threats after its dissolution, PEG believed it necessary to also prepare an Order to Show Cause, pursuant to 28 U.S.C. § 2361, which would grant PEG immediate, as well as permanent relief, enjoining all defendants from instituting or prosecuting any proceeding with respect to the Disputed Fund.[4] After obtaining the Order to Show Cause from this Court and serving all parties, Proskauer then expended time in telephone conversations with various defendants regarding both scheduling and substantive issues, in negotiating a release for one of the defendants (defendant Bernstein Litowitz Berger & Grossman LLP) and preparing for and attending the hearing held by this Court on June 25, 2007, at which the Court granted PEG the relief sought in its Order to Show Cause. Proskauer's fees and disbursements for this work amounted to $18,137.50.[5]

---

[4] PEG's earlier drafts of an Order to Show Cause related only to an Order directing it to deposit the Disputed Fund; PEG did not take action to seek injunctive relief against the defendants until after Ajamie's TRO.

[5] In addition to Proskauer's and Bracewell & Guiliani's fees and disbursements, PEG separately incurred the cost of bonding the TRO relief granted by this Court ($158.00). A copy of the invoice for the bond is annexed as Exhibit C.

11

33.     Needless to say, virtually all the fees and disbursements incurred in the second or third phase would not have been incurred had Ajamie simply consented to PEG's efforts to an orderly and expedited divestiture of the funds in PEG's possession at the outset.

34.     The Proskauer attorneys who worked on this matter are highly-qualified attorneys with distinguished records. I am a 1983 graduate of Emory University, where I was inducted into the Phi Beta Kappa Society. Thereafter, I graduated *cum laude* from Georgetown University Law Center in 1986, and was subsequently admitted to the New York and New Jersey bars in 1987. I have since been admitted to practice in various federal courts, including the Southern and Eastern Districts of New York, and the Second and Third Circuit Courts of Appeal, as well as admitted *pro hac vice* in other federal district courts throughout the country.

35.     I am a partner in Proskauer's Litigation and Dispute Resolution Department, where I am a co-head of the Financial Services Practice Group, and have over 20 years experience in civil and commercial litigation, including substantial trial, arbitration and appellate experience representing various financial services clients. I have represented PEG in litigation and arbitration matters over the last four years.

36.     Stephen Ratner is a 1971 graduate of Columbia University, and a 1974 graduate of Columbia Law School, where he was a Harlan Fiske Stone Scholar. He is a partner in Proskauer's Litigation and Dispute Resolution Department and a co-head of the Department Financial Services Practice Group. Mr. Ratner has substantial experience handling complex matters including securities and commodities litigations, investigations and enforcement proceedings, arbitrations and mediations, compliance issues, and regulatory controversies on behalf of major brokerage firms and other leading financial institutions. Mr. Ratner has represented PEG for more than 20 years.

37. Karen Coombs is a 1991 graduate of Barnard College, Columbia University, and received her law degree *magna cum laude* from the University of Miami School of Law in 1995. Following a clerkship on the Third Circuit Court of Appeal, Ms. Coombs was admitted to the Florida and District of Columbia bars in 1996, and to the New York bar in 2000.

38. Finally, Elizabeth Figueira graduated *summa cum laude* and Phi Beta Kappa from the University of Pennsylvania in 2002, and received her law degree from New York University School of Law in 2006. She was admitted to the New Jersey bar in 2006 and the New York bar in 2007.

39. With respect to the reasonableness of Proskauer's fees, the billing rates charged by the Proskauer attorneys are consistent with rates for similar services provided by lawyers at similar firms with like experience and comparable reputations, and the hours charged and detailed in Exhibit A were reasonably required to perform the necessary legal work in this highly-contested matter involving significant sums. *See Landmark Chemicals*, 234 F.R.D. at 64 (rates of $285 to $590 per hour in connection with preparation of interpleader action held reasonable); *Merrill Lynch*, 2001 WL 536929, n.2 (S.D.N.Y. May 21, 2001) (hourly rates charged by Brown & Wood in connection with interpleader action are comparable to rates charged by similar law firms in Manhattan for matter of similar complexity; awarding attorneys' fees in the sum of $263,963.63).

40. Moreover, the pro-forma statement establishes that Proskauer provided the services it did in an efficient fashion. The vast majority of the work was done by two lawyers who have been consistently responsible for this matter, myself and Ms. Coombs, thus avoiding time charges for new attorneys to "get up to speed." At the same time, appropriate tasks, such as

13

the legal research necessary to determine procedural and jurisdictional requisites for an interpleader action, were performed by a younger associate with a lower billing rate.

41.   Proskauer has sought to be efficient in the time expended on this matter. At the same time, the amounts involved are substantial and, as Ajamie's actions make clear, issues as seemingly mundane as where to commence an interpleader action became hotly-contested matters. Thus, the time Proskauer has spent was reasonably necessary to ensure that this interpleader action adequately protected PEG's interests, and to ensure that PEG would not be subject to duplicative and contradictory multi-million dollar claims for the same Disputed Fund.

42.   For all of the foregoing reasons and those in the accompanying declaration of Christina Ponig, PEG respectfully requests that this Court render an award to it of attorneys' fees, disbursements and costs in the aggregate amount of $69,439.74.

Dated: New York, New York
       July 3, 2007

                                                        _____
                                                              DAVID A. PICON