UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PRUDENTIAL EQUITY GROUP, LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>THOMAS R. AJAMIE, AJAMIE LLP, ROBERT WEISS, ROBERT H. WEISS & ASSOCIATES, LLP, JOHN MOSCOW, BRIAN ROSNER, ROSNER NAPIERALA LLP, DAVID ROBBINS, KAUFMANN FEINDER YAMIN GILDIN & ROBBINS, LLP, WALLACE SHOWMAN, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, ROBERT KRAUS, KRAUS & ZUCHELEWSKI LLP, MARTIN KROLL, KROLL, MOSS & KROLL LLP, JOHN DOES 1-25, AND ABC CORPORATIONS 1-25,<br><br>                    Defendants. | No. 07-CV-5606 (JSR)<br><br>**DECLARATION OF<br>THOMAS R. AJAMIE** |

THOMAS R. AJAMIE deposes and states:

1.  I am an attorney licensed to practice before the Courts of the State of Texas. I began my legal career in 1985 when I went to work for Baker Botts in Houston. About nine years ago I founded my own law firm. We have seven lawyers and specialize in securities matters and other complex litigation.

**Overview**

2.  In the action in which I represented members of the Sahni family, a three-member arbitration panel of the New York Stock Exchange awarded the family $14.5 million in damages and interest against Prudential Equity Group, LLC ("Prudential") in May 2006. The New York State Supreme Court confirmed the award and entered a

judgment against Prudential on December 15, 2006, and a further order on February 15, 2007.

3.    In the months following the award, Prudential and its counsel have taken every imaginable step to delay payment of the funds due to the Sahni family and its lawyers.  Although the award and the Court's judgment, by their terms, accrued interest on the awarded amounts, Prudential demanded, as a condition to paying the Sahni family their portion of the award, that interest cease accruing.  David Picon, Prudential's counsel at Proskauer Rose, threatened to commence an interpleader of the entire award if the Sahnis' counsel declined to agree to these terms.  Mr. Picon knew that interpleading the entire award would further delay the family's receiving its money; and at that point it had been seven years since the family had been without funds, as Prudential's mismanagement caused the Sahnis to lose their family's savings.  Accordingly, Prudential was able to retain millions of dollars without paying interest, resulting in a benefit to Prudential of $61,412.23.

4.    The attorneys' fees, representing 30% of the total arbitration award and judgment, are the subject of the interpleader before this Court.

**The Arbitration and the Award.**

5.    I was the lead counsel in the case styled *Charanjit Sahni, et al., v. Prudential Equity Group, LLC (a/k/a Prudential Equity Group, Inc.).*  I, together with the lawyers and staff in my office, worked on the Sahnis' matter for over 4½ years. Our law firm is based in Houston, Texas.  We prepared the case, interviewed witnesses, analyzed thousands of pages of documents, worked with the clients, prepared for arbitration hearings, filed pleadings, and hired and worked with expert witnesses, among other tasks.

We spent thousands of hours on this matter over the past 4½ years. I personally spent over $550,000 in out-of-pocket expenses alone, and our law firm spent millions of dollars in attorney time working on this matter. There are 35 boxes of pleadings, documents, transcripts and other materials in our Houston office.

6.  This case came about after the Sahni family opened four accounts with a combined value of $23 million at Prudential in February 2000. Within months, the accounts under Prudential's management lost $21 million, or 90% of their value. Two of the accounts were discretionary accounts where Prudential owed a fiduciary duty to the Sahni family in managing them. The two other accounts were custodial accounts for the Sahnis' minor children.

7.  My law firm began working on this matter in October 2002. The arbitration hearings began in September 2003 and were completed in April 2006. Over this 2½ year period, the three New York Stock Exchange arbitrators convened eighty-three hearing sessions over forty-four days. They heard testimony from thirty-seven witnesses, including seven expert witnesses. More than 11,000 pages of documents were exchanged by the parties. The transcript of the arbitration hearing is over 9,000 pages, and 241 exhibits were admitted into evidence.

8.  I was lead counsel at the arbitration hearings. John Moscow and Wallace Showman assisted me in the arbitration at various times.

9.  I was originally brought into the case by Robert Weiss, who was supposed to represent the Sahni family jointly with me. He, however, completely abandoned the case a few months after I became involved. Mr. Weiss did not participate in any way in

the arbitration hearings, and he performed no work on the Sahnis' case during or after the hearings.

10. In May 2006, a three-member arbitration panel unanimously awarded the Sahni family $11.8 million, plus interest, against Prudential.

**Prudential Filed an Unsupportable Motion
to Vacate the Arbitration Award.**

11. After the arbitration panel awarded our clients $11.8 million, plus interest, we moved to confirm the award in New York State Supreme Court on May 31, 2006. Prudential challenged the award and filed a Motion to Vacate on June 16, 2006.

12. Prudential was very aware that it had lost all of the Sahni family's money and that the family was under severe economic strain. Nevertheless, Prudential filed its Motion to Vacate the arbitrators' unanimous award on the grounds that the award was completely irrational and in manifest disregard of the law.

13. The task for a party seeking to vacate an arbitration award is a "formidable one" and the challenging party bears a heavy burden of proof. *Hamilton v. Sirius Satellite Radio Inc.,* 375 F.Supp.2d 269, 273 (S.D.N.Y. 2005).

14. An arbitration award may be vacated if the party seeking vacatur proves to a court that the award is completely irrational and in manifest disregard of the law. *Matter of Arbitration No. AAA13-161-0511-85 Under Grain Arbitration Rules,* 867 F.2d 130, 133 (2d Cir. 1989). The ground of manifest disregard of the law is a doctrine of last resort, limited to those rare occurrences of "egregious impropriety" on the part of the arbitrators, "where none of the provisions of the [Federal Arbitration Act] apply." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S,* 333 F.3d 383, 389 (2d Cir. 1997). It is a doctrine that "gives extreme deference to arbitrators." *DiRussa v. Dean*

4

*Witter Reynolds Inc.,* 121 F.3d 818, 821 (2d Cir. 1997), *cert. denied*, 522 U.S. 1049 (1998).

15.     Yet, despite the formidable standard for vacating an award, Prudential *did not even provide the record of the arbitration proceedings* when it filed the Motion to Vacate.  By failing to provide the record, Prudential could *never* meet its high burden to obtain vacatur.  Without the record, Prudential could not show that there was "no proof whatsoever to justify the award" so as to render it completely irrational.  Similarly, absent the record, Prudential could not show that it presented the law to the arbitrators or that the arbitrators knew the law and then disregarded it.

16.     During this time, Mr. Weiss did not offer to help with the confirmation proceedings or to resist Prudential's Motion to Vacate the award.  Weiss's only activity during the confirmation process involved his serving a charging lien upon Prudential and pursuing his claim for fees.  My team of lawyers and I (including Robert Kraus of Kraus & Zuchlewski, and David Robbins of Kaufmann, Feiner, Yamin, Gildin & Robbins LLP, both who have been fully paid for their services and have assigned their fee claims to Ajamie LLP) worked for six months to oppose Prudential's Motion to Vacate.  On December 15, 2006, the New York State Supreme Court (Tolub, J.) filed a written decision and confirmed the award.  The amount of the total award, including interest, eventually grew to $14.9 million.

**Prudential Holds the Sahni Family's Money.**

17.     The attorneys' representation agreement with the Sahni family provided that the attorneys would earn a 30% contingency fee.  Once the arbitration award was confirmed, Prudential was unwilling to pay the award because Mr. Weiss had asserted an

attorney's lien on the proceeds. I was very concerned about getting into the Sahnis' hands the 70% of the award that belonged to them. The Sahni family had lost nearly all of its money through the Prudential accounts and the family needed the funds.

18. Accordingly, following confirmation of the award, I asked Prudential's counsel, David Picon of the Proskauer Rose law firm, to release the 70% of the of the award that belonged to the Sahni family. Picon refused to release the family's money unless I agreed that interest would stop running on the award and that Prudential could hold the money "interest free." A copy of the email from Mr. Picon is attached as Exhibit A.

19. For a period of five weeks, I worked with Proskauer Rose to provide it with all the documentation it demanded as a condition to releasing the funds that belonged to the Sahni family.

20. Neither Weiss nor his counsel assisted in these efforts. In fact, they both acted as an impediment to disbursement of the funds. Both Weiss and his counsel focused their efforts on obtaining Weiss's claimed fee, instead of getting the Sahnis their money.

21. Mr. Picon repeatedly threatened to deposit the entire award, including the Sahni family's 70%, into the registry of a court unless Prudential's demands were met. This would have caused additional time and expense for the Sahni family. I made numerous proposals to Proskauer Rose to effect disbursement of 70% of the award to the Sahnis.

22. I offered to have the clients' 70% disbursed out of my trust account, as has been my standard practice for over twenty years in disbursing client funds. I worked with

Prudential to secure waivers from Weiss and other counsel to the clients' 70% of the funds. Prudential required such waivers as a prerequisite to distributing funds to the Sahni family. After obtaining the waivers and other agreements, Prudential disbursed 70% of the award to the Sahnis.

23. My counsel and Mr. Weiss's counsel discussed placing the 30% attorneys' fees into an interest-bearing escrow account. However, apart from engaging in discussions, Mr. Weiss's lawyer did not take any visible steps toward achieving a transfer of the funds. He did not prepare any proposal or agreement concerning such an escrow. He did not take steps to identify institutions to hold the funds. In short, he simply discussed an idea with no follow-up. Moreover, even if the funds had been placed into an escrow account, a court's assistance likely would have been needed to partition the amounts due to Mr. Weiss and to me.

**Prudential Exaggerates the Fee Dispute.**

24. In this interpleader, Prudential paints a misleading picture of the dispute by naming lawyers who have little or no interest in the funds. In its rush to turn a mole hill into a mountain, Prudential has sued two lawyers and two law firms that have already been paid in full: Robert Kraus and his firm Kraus & Zuchlewski LLP, and David Robbins and his firm Kaufmann, Feiner, Yamin, Gildin & Robbins, LLP. Prudential has sued a law firm that had no involvement whatsoever in this matter, Bernstein Litowitz Berger & Grossmann.

25. Here are the lawyers and law firms that claim an interest in the fund deposited by Prudential in this matter:

      a.    <u>Thomas R. Ajamie and his law firm, Ajamie LLP:</u>   Ajamie worked on this matter for 4½ years and did 90% of the work.

      b.    <u>Robert Weiss and his law firm, Robert H. Weiss & Associates, LLP:</u> Weiss signed the attorney representation letter with the Sahni family in April 2002. Shortly after bringing me into the case in October 2002, Weiss stopped working on the matter.

      c.    <u>John Moscow and his former law firm, Rosner Napierala LLP, and his former partner Brian Rosner:</u> John Moscow was a partner of Rosner Moscow & Napierala in 2005, when he began to work on the matter. Brian Rosner, a former partner of Mr. Moscow, did no work on the Sahnis' case, but now claims a fee interest because he was Mr. Moscow's law partner.

      d.    <u>Wallace Showman:</u> Mr. Showman worked on the matter and has a claim to fees.

      e.    <u>Martin Kroll and his law firm, Kroll, Moss & Kroll LLP:</u> This firm was the Sahni family's first set of lawyers in this matter. Mr. Kroll claims he had a partial contingency fee arrangement and is owed a percentage of a tiny nuisance-value settlement offer that Prudential made many years ago.

26.    Other than Mr. Weiss, none of the other lawyers has asserted a lien against the funds held by Prudential.

27.    As a prerequisite to disbursing money to the Sahnis, Prudential demanded that I identify every lawyer who worked on the case. Even though none of the lawyers other than Mr. Weiss had made a claim against Prudential, Prudential insisted on knowing of everyone who worked on the case and could possibly have an interest in

attorneys' fees. Prudential has now sued them and others in this interpleader, making the case look more complex than it is.

**The Texas Action.**

28.  I believe that I am entitled to the attorneys' fees earned in the Sahni case and that Mr. Weiss breached his agreement to assist with the case. Mr. Weiss agreed to work on the case, which he completely failed to do. He agreed to share expenses, which he also failed to do. As a result, my firm incurred over $550,000.00 in expenses which have not been reimbursed, including the costs of five expert witnesses. If Mr. Weiss is entitled to a small portion of the fee, the expenses and costs of other attorneys should be deducted from his share.

29.  I filed a suit in Houston, Harris County, Texas against Mr. Weiss for a declaratory judgment and damages. For several months, Weiss's lawyers and my lawyers tried to resolve our dispute. After settlement talks broke down, the Texas suit was served on Mr. Weiss in March 2007.

30.  Prudential had reserved its right to place the money into the registry of the court. A copy of emails from Prudential's counsel is attached as Exhibit B. At that time, only one court case was pending: the Harris County, Texas action. Harris County is where my law firm -- the law firm that performed 90% of the work in the case -- is located. Prudential knew this. For over four years, Prudential's lawyers fought my team of lawyers and me on a weekly basis. Prudential knew very well who its opponents were, that my firm and I were lead counsel on the case, and that we were due payment for our work in Houston, Harris County, Texas.

31.     After the Texas suit was filed, Prudential held possession of the 30% fee on which it refused to pay interest. My counsel added Prudential as a defendant to the Texas suit in order to preserve the funds in an interest-bearing account and to ensure a proper division of the funds in accordance with an anticipated order of the Texas court. I remained optimistic that Prudential's role could be resolved short of litigation. Hence I did not request immediate service of citation on Prudential. However, I subsequently learned that Mr. Weiss had filed suit against me in New York, and Prudential said it would file an interpleader in New York. Thus, although the Texas suit was progressing and set for trial, I faced the spectre of two additional suits which would require me to travel and incur further expense.

32.     I also learned through news reports that Prudential Equity Group (the entity that lost all the Sahni family's savings) was being dissolved by its parent company. To protect the Texas court's jurisdiction to resolve the dispute between Mr. Weiss and me, and to ensure that the funds were held in a safe place, my counsel requested that the funds held by Prudential be deposited into the registry of the Texas court. The Texas court granted a temporary restraining order and set a hearing.

33.     Rather than proceed to the hearing and depositing the attorneys' fees into the registry of the Texas court, Prudential chose to file two motions to dissolve the restraining order. After reviewing Prudential's motions and considering their merits, my counsel and I determined not to oppose them. At Prudential's request, the Texas court dissolved the restraining order, and Prudential then filed this suit.

34.     In addition to addressing the restraining order, Prudential's counsel participated in Mr. Weiss's challenge to the Texas court's jurisdiction over his person, a

proceeding known in Texas as a special appearance. I understand that Prudential's counsel sat with Mr. Weiss and his counsel and consulted with them during the special appearance hearing. The hearing, including a lunch break, took about 2 ½ hours. Prudential's Texas counsel billed at least 8 hours for this activity. This is one example of Prudential's unnecessary billing of time to this matter. Prudential did not have a stake in the outcome of the special appearance, and there was no need for Prudential's counsel to participate in the proceeding or bill its fees to the funds on deposit with this Court.

**Prudential's Attorneys' Fees.**

35.    I have reviewed Prudential's fee application. In my opinion, the fees requested by Prudential are excessive. An interpleader is a fairly simple proceeding. It was not necessary for Prudential to prepare and file its lengthy memoranda of law or to schedule a "show cause" hearing. Prudential assigned an attorney to perform research on venue issues, a question that is squarely addressed in 28 U.S.C. § 1397. Prudential requests $3,000.00 for this research, a task which should have required no more than 30 minutes. Prudential's Texas counsel spent 8 hours on Mr. Weiss's special appearance, a matter which did not even involve Prudential. Prudential's bills for attorneys' fees contain many redacted entries, making it impossible to determine whether the work performed was reasonable or necessary.

36.    In my opinion, a reasonable fee for Prudential's attorneys for pursuing the interpleader, and any steps preparatory to the interpleader, is the sum of $15,000.00.

**Prudential Avoided Paying Interest on the Funds.**

37.    As part of Prudential's conditions for disbursing the Sahnis' money, Prudential held the Sahni family's money, and all attorneys fees -- an amount of almost

$15 million -- from March 9 until April 3, 2007 (when Prudential finally transferred the money to the Sahni family).  During this time Prudential avoided paying approximately $33,376.25 in interest that otherwise would have accrued on the award -- $23,363.50 attributable to the Sahnis' 70% of the award, and $10,012.75 attributable to the attorneys' fees.  On April 3, Prudential distributed the Sahnis' portion of the award and kept the remaining $4,482,944.00, comprising the attorneys' fees, until it deposited this sum with the Court on June 12, 2007.  From April 3 to June 12, 2007, Prudential avoided paying $36,120.70 in interest that would have accrued on this amount under the terms of the award.  Through its actions, and its delay of the resolution of this matter, Prudential has kept a total of some $69,496.95 in interest which otherwise would have been credited to the Sahni family and their counsel.

38.   Prudential is a sophisticated financial institution that puts its available funds into investments that earn returns.  Assuming that Prudential put the funds it set aside to pay the Sahni award in a money market account earning 4%, it earned a total of $75,329.84 in interest on these funds. It earned $40,940.13 on the $14,943,149.61 it held from March 9 until April 3 and it earned $34,389.71 on the $4,482,944.88 it held from April 3 until June 12. This amount should be credited against any attorneys' fees awarded to Prudential in this matter.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: Houston, Texas
       July 18, 2007

_____

12