UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

PRUDENTIAL EQUITY GROUP, LLC

                                Plaintiff,

              -against-

                                                       AFFIDAVIT

THOMAS R. AJAMIE, AJAMIE LLP, ROBERT
WEISS, et al.
                                                       07 CV 5606 (JSR)

                                Defendants.
----------------------------------------------------------------X

State of New York        )
                              ) ss:
County of New York   )

    I, Robert H. Weiss, being duly sworn deposes and says:

1.     I am a defendant/cross-claimant in the above captioned action.

2.     I submit this affidavit, a statement pursuant to local rule 56.1 (Exhibit A) and the accompanying memorandum of law in support of my motion for summary judgment or partial summary judgment against the other co-defendants/cross-claimants ("co-defendants") in this interpleader action brought by plaintiff.

3.     This interpleader action was commenced by Plaintiff seeking permission to deposit monies in Court to allow the co-defendants, all of whom are attorneys or law firms, to resolve a dispute over legal fees earned as a result of an NYSE securities arbitration award against Plaintiff. This Court granted Plaintiff's application and the monies in dispute have been deposited in an interest bearing account of the court system. As a result of the monies being deposited in court, Plaintiff has not actively participated in the action.

4. To this point in the action, defendants have exchanged documents and depositions have been taken of me, Thomas Ajamie, Esq. ("Ajamie") and John Moscow, Esq. ("Moscow").

5. A threshold issue for this motion is whether Ajamie engaged in the unauthorized practice of law by performing substantial legal work in New York State in a New York Stock Exchange ("NYSE") securities arbitration that would preclude him from receiving a legal fee for his work in New York. If this argument is denied, the central dispute in this action is whether an amended fee sharing agreement between me, as originating attorney, and Ajamie, who was subsequently brought in as counsel, is enforceable. Ajamie has denied that he engaged in the unauthorized practice of law and he claims that I breached our amended fee sharing agreement.

6. There are numerous sharp factual disputes between me and Ajamie regarding our conduct in the underlying NYSE securities arbitration. However, these factual disputes do not in anyway preclude summary judgment on the issue of the unauthorized practice of law and/or enforceability of the parties' amended fee sharing agreement. The facts presented in the annexed Rule 56.1 Statement and the law presented in the accompanying memorandum fully supports this motion.

**Robert Weiss Is Retained**

7. In or about February 2000, Charanjit Sahni, Harpreet Sahni, Nasimang Enterprises, AVV/Nasimang Trust by Nand Sahni and Charanjit Sahni; Charanjit Sahni Custodian Angad Sahni Utma; and Charanjit Sahni Custodian Simran Sahni Utma (collectively "Sahni Clients") tendered $22 million to Prudential Equity Group, LLC ("Prudential") to provide brokerage services. Within a few months the Sahni Clients sustained losses of $22 million. The Sahni Clients, New York residents, residing in New York, believed the losses were a result of

negligence, breach of fiduciary duty, unsuitable trading, lack of supervision and other violations of the securities laws by a New York branch of the Plaintiff.

8. In or about April 16, 2002, the Sahni Clients consented to submitting their claims to binding arbitration. Plaintiff entered into a similar agreement in or about June 2002.

9. Upon information and belief, in or about August 2001, the Sahni Clients consulted co-defendant Kroll, Moss & Kroll, LLP, ("Kroll Firm") regarding the aforementioned losses. The Sahni Clients retained the Kroll Firm. (Exhibit B)

10. Shortly thereafter, the Sahni Clients terminated the Kroll Firm's representation. (Exhibit C)

11. On or about April 1, 2002, the Sahni Clients retained my law firm, Robert H. Weiss & Associates, P.C., through me, Robert H. Weiss, Esq., (jointly referred to as "Weiss") to prosecute their claim against Plaintiff. The Sahni Clients agreed in a written retainer to pay my firm 30% of any recovery as a legal fee. I agreed to pay any legal fee owed to the Kroll firm out of my 30% share. (*See*, Exhibit D)

12. I and my firm immediately began to work on the matter. My office obtained information from the Sahni Clients and my office conducted legal research on the pertinent issues. (*See e.g.*, Exhibit E) I also consulted securities experts, some of whom were used at the arbitration. (*See e.g.*, Exhibit E) My office drafted a complex Statement of Claim and filed it with the NYSE on behalf of the Sahni Clients in or about April 2002. ("Sahni Arbitration" or "Arbitration")(*See*, Exhibit F) My firm began to seek more information to further the Sahni Clients' claim and we received documents regarding the case. I also contacted Plaintiff's counsel to move the matter forward.

- 3 -

13. Originally, Kroll refused to turn over the documents he obtained and I consulted an attorney to bring suit, but eventually I negotiated the transfer of the documents. (*See*, Exhibit C)

**Ajamie Agrees to Act as Co-Counsel**

14. Ajamie and I became acquainted at a PIABA (Public Investors Arbitration Bar Association Meeting) meeting in Florida.

15. At one PIABA meeting, Ajamie informed me that he had an office in Texas and he was only admitted to practice law in Texas. However, he was a lawyer with extensive securities arbitration experience, who had handled cases all over the country.

16. I thought that Ajamie's expertise would be enormously helpful with the Sahni case because I was beginning to discover that it was a large, complicated case. I mentioned the Sahni Arbitration to Ajamie and informally inquired if he would be interested in acting as co-counsel with me. Ajamie did not know any of the Sahni Clients before I commenced the Sahni Arbitration. This was only a preliminary discussion and no agreement was reached at that time.

17. Ajamie and I spoke on the telephone a number of times. In or about October 2002, Ajamie orally agreed to become my co-counsel in the Sahni Arbitration and we agreed that we would each receive 50% of any legal fee recovered and each party would be equally responsible for the law suit. Ajamie never mentioned that he would retain additional trial counsel, outside his firm, to assist in the Sahni Arbitration.

18. Sometime shortly thereafter, I spoke to the Sahni Clients and asked permission to have Ajamie act as co-counsel. I explained to the Sahni Clients that I would continue to work on the case as co-counsel and I would remain responsible for their case. The Sahni Clients authorized Ajamie to work as co-counsel.

19. Ajamie <u>never</u> entered into a written retainer with the Sahni Clients.

20. Ajamie drafted a letter to serve as a fee sharing agreement ("First Fee Agreement") memorializing our previous discussions. He forwarded it to me. This First Fee Agreement was executed in October 2002.

21. The First Fee Agreement stated, in part, that:

> This letter sets forth our agreement to work together on behalf of the Sahni Clients. We will jointly represent the Sahni Clients in connection with their securities claims . .
>
> We will work with you on behalf of the Sahni Clients in preparing and presenting their claims . . .
>
> You have consulted the Sahni Clients and you represent to us that they are aware of our participation in the matter and consented to it.

(*See*, Exhibit G)

22. After the First Fee Agreement, my firm initially worked on the Sahni Clients' case with Ajamie and I participated in some witness meetings and meetings with the Sahni Clients. I consulted with Ajamie on strategy and my associates worked on the case and communicated with Ajamie. (*See*, Exhibit H)

23. But it became increasingly difficult for me or my office to communicate with Ajamie. At some point in late 2003 early 2004, Ajamie refused to respond to my telephone calls and he made it impossible for me or my office to provide assistance in the Sahni Clients' case.

24. I stayed abreast of the Sahni Arbitration from copies of letters I received from Ajamie (up until a point) and plaintiff's counsel and sporadic contact from Ajamie. A few examples of the correspondence are annexed as Exhibit I. I also communicated with the Sahni

Clients, who were clients with whom only I had a retainer agreement and for whom I was responsible as attorney of record.

25. In September 2003, I eventually wrote a letter to Ajamie complaining about his failure to return my telephone calls. (*See*, Exhibit J)

26. The Sahni Clients' Arbitration hearing against Plaintiff commenced in September 2003 in New York and I or my associate attended fourteen hearing sessions (usually two hearing sessions a day). (*See*, Exhibit K)

27. However, in 2004, while the arbitration was proceeding, Ajamie told me that he did not want me to attend the Sahni Arbitration hearings and, in essence, he did not want my assistance.

28. In or about February 2004, defendant Ajamie demanded that we amend the First Fee Sharing Agreement, in essence, because he was doing all the work. In fact, the amount the amount of work he was doing was a result of his refusal to allow me or my office to actively participate.

29. An amendment to our original Fee Agreement was drafted. This amended agreement changed the proportion of the percentages of the fees that each party would receive from any settlement or award. My percentage was reduced to 34% (from 50%) and Ajamie's percentage was increased to 66%. The parties executed the agreement on or about February 16, 2004 in Florida ("Amended Fee Agreement"). (*See*, Exhibit L)

30. The Amended Fee Agreement stated, in part, that:

> Mr. Ajamie agrees to **handle the case** and **continue to try it** before the NYSE panel. (Emphasis added)

31.     This provision was in conformity with our discussion that Ajamie did not want or need me to work on the case and that he would be responsible **for handling and trying the case.** However, it was clear I would remain responsible to the Sahni Clients. In essence, the Amended Fee Agreement was converted to a fee sharing agreement in which Ajamie would be responsible for the majority of the legal work, but I would be responsible to the clients, pursuant to my original retainer agreement.

32.     The Amended Fee Agreement also stated that:

> Mr. Weiss also agrees to pay from his 34% **all amounts due** to other lawyers for law firms who make a claim or lien against this case. (emphasis added.)

33.     This provision was in response to **existing** claims by prior counsel that could be asserted in the future, in particular, the Kroll firm, and another attorney, Robin Nachman, Esq.

34.     There was no discussion that claims by other attorneys retained in the future would be covered by this provision and defendant never mentioned his intention of retaining other counsel to assist him. To the contrary, Ajamie gave the clear impression that he and his firm, with only minor help from me, would handle the Sahni Clients' Arbitration. This was the precise reason that I agreed to a reduced percentage. This was the type of fee division (*i.e.*, 1/3-2/3) that was customary in New York for a referral (joint responsibility) arrangement.

35.     In February 2004, shortly after the Amended Fee Agreement was executed, I confirmed with the Sahni Clients, in writing, the new fee arrangement and my continuing responsibility. (*See*, Exhibit M)

36.     In early 2004, during the course of the arbitration proceeding, Ajamie decided to move to recuse one of the arbitrators and he retained the services of New York attorney Wallace Showman, Esq. ("Showman"). Showman was not affiliated with Ajamie's law firm. Showman

is currently a co-defendant herein. Showman had no written retainer with the Sahni Clients and neither he nor Ajamie provided a written disclosure of his participation in accordance with DR 2-107 of the New York Code of Professional Responsibilities ("Code").

37. A motion was filed in New York State Supreme Court.

38. I was not asked to draft, file or participate in the recusal motion.

39. Ajamie made the decision to move to recuse the arbitrator and he drafted an affidavit in support of the motion. It was filed in New York State Supreme Court by Showman. New York State Justice Kibbie F. Payne denied the application. The motion was based, in part, on New York law. (*See*, Exhibit N)

40. In or about March 2005, approximately a year after the Amended Fee Agreement was executed, Ajamie retained the services of John Moscow, Esq. ("Moscow"), to participate in the Sahni Arbitration, who was affiliated, at the time, with Rosner, Moscow & Napierala, and LLP. Moscow attended his first arbitration hearing on or about May 5, 2005 and he attended approximately nine sessions.

41. Ajamie entered into a fee sharing agreement with Moscow's firm that entitled Moscow and/or his firm a substantial fee. (*See*, Exhibit O) Neither Moscow nor his firm was affiliated with Ajamie's firm. Both Moscow and his former firm are co-defendants herein.

42. Ajamie did not inform me of his intention to enter into his agreement with Moscow and did not seek permission from me to retain Moscow at that the time he entered into their agreement. Moscow had no written retainer with the clients and neither he nor Ajamie sent a written notice to the clients of this fee split pursuant to DR 2-107(A).

43. By the end of the Sahni Arbitration, Ajamie conducted more than 80 arbitration sessions in New York, encompassing over 40 hearing dates.

44. On or about May 18, 2006, an Arbitration Panel awarded the Sahni Clients $11.8 million, plus interest. (*See*, Exhibit P)

45. Ajamie never applied to be admitted *pro hac vice* in New York during the Sahni Arbitration hearing process even though he provided extensive legal services in New York. He met with the Sahni Clients in New York between 60-90 times. He met many fact witnesses and some expert witnesses in New York. He attended numerous hearing sessions in New York and he participated in a motion to recuse in New York State Supreme Court. He first applied for *pro hac vice* status after the filing of a post-arbitration motion in New York State Supreme Court.

46. I presumed Ajamie, as an extremely experienced national securities arbitration expert, who had handled cases in many states other than his home state, Texas, would take whatever steps necessary to obtain proper authorization to handle the Sahni Arbitration in New York.

**Post Arbitration**

47. After the Arbitration Panel rendered their award, Ajamie, without consulting me, retained Robert Kraus, Esq. to handle the motion in New York State Supreme Court to oppose plaintiff's motion to vacate the award and the Sahni Clients' cross-motion to confirm the award. Kraus was not a member or employee of Ajamie's firm. I was not asked to handle or to participate in anyway with this motion. Kraus was a former co-defendant herein, but Ajamie has settled any fee issue with him on his own. Kraus had no written retainer with the Sahni Clients and neither he nor Ajamie sent a notice to the clients pursuant to DR 2-107(A).

48. The Arbitration award was confirmed. (*See*, Exhibit Q)

49. The Sahni Clients have received their share of the settlement monies, minus the legal fees. The remainder of the settlement, the legal fees for the Sahni case, is the subject of this interpleader action.

WHEREFORE, I respectfully request that this Court grant my summary judgment motion and determine that:

(i) Ajamie is not entitled to any legal fee for work in New York in Sahni Clients' case because he engaged in the Unauthorized Practice of Law; or, in the alternative,

(ii) Ajamie and Weiss's Amended Fee Sharing Agreement is enforceable as a matter of law; and,

(iii) All current and former co-defendants, other than Kroll, should seek their legal fees owed for work in the Sahni Arbitration from Ajamie, who was the party who contracted for their services, and not the disputed funds deposited in Court; or,

(iv) Grant any further or different relief is deemed fair, just or equitable.

_____
ROBERT WEISS

Sworn to before me this 2nd day of
January, 2008.

_____
Notary Public

MARIA C. BURATTINI
Notary Public State of New York
Nassau County
My Commission Expires: 11-16-06
Registration #: 01BU6016359