NEW YORK STOCK EXCHANGE, INC.
-----------------------------------------------------------------------X
CHARANJIT SAHNI, HARPREET SAHNI, NASIMANG
ENTERPRISES AVV/NASIMANG TRUST by
NAND SAHNI and CHARANJIT SAHNI,
CHARANJIT SAHNI Custodian ANGAD SAHNI
UTMA, and CHARANJIT SAHNI Custodian SIMRAN
SAHNI UTMA,

                                  Claimants,

**STATEMENT OF CLAIM**

-against-

PRUDENTIAL SECURITIES INCORPORATED, STUART SKLAR,
MARTIN KENNEDY, ANDREA KLEIN, AND ASH RAJAN

                                  Respondent.
-----------------------------------------------------------------------X



EXHIBIT
W-8 for ID
[signature] 12/14/07

1) **PARTIES:**

    A)    CLAIMANTS – Claimants Charanjit and Harpreet Sahni are husband and wife. Claimant Nand K. Sahni is the 83-year-old mother of Claimant Charanjit Sahni and the doner of the assets invested by Nasimang Enterprises. Claimant. Claimants Angad and Simran Sahni are the minor children of Claimants Charanjit and Harpreet Sahni. Claimant Nasimang Enterprises AVV is foreign corporation that was formed to invest the assets of the Nasimang Trust for the benefit of Nasimang Enterprises AVV. Nasimang Trust is the sole Shareholder of Nasimang Enterprises AVV and Nand K. Sahni, Charanjit Sahni and Harpreet Sahni are the officers of said corporation. Said individuals will hereafter be referred to as "Claimants". Claimants are public investors who resided in Roslyn Heights, New York at all times pertinent hereto.

    B)    RESPONDENTS - Respondent Prudential Securities, Inc. (hereafter referred to as "PSI" or "Respondent") is a full service brokerage firm located in New York. Mitesh Shere (hereafter "Shere") is the financial advisor assigned to the Claimant's account. Stuart Sklar (hereafter

"Sklar") is the Branch Office Manager of PSI's offices located at 1411 Broadway, New York, NY. He is assigned to supervise the handling of Claimant's accounts. Martin Kennedy (hereafter "Kennedy") is, the Operations Manager of PSI assigned to handle the Claimant's account. Andrea Klein (hereafter "Klein") was the Compliance Director of PSI at all times Pertinent hereto. Ash Rajan is the PSI Senior Analyst assigned to review and advise public investors regarding At Home Corp., Priceline.com stock and other Internet securities. They are all industry members collectively referred to hereafter as "Respondents".

2)  BROKERAGE ACCOUNTS:

The PSI brokerage accounts involved in the Claim bear account numbers:

>   HKA-965638-23
>   HKA-094637-23
>   HKA-094629-23
>   HKA-094581-23

3)  BACKGROUND INFORMATION:

Claimant Charanjit Sahni is a jewelry salesman with an office in Manhattan. His wife, Harpreet is a working mother who is responsible for raising the Sahnis' two young children. Claimant Nand K. Sahni is the 83-year-old mother and grandmother of the other Claimants. The Claimants are of Indian descent as is their former financial advisor, Mitesh Shere.

Claimants first became acquainted with Shere in 1997 as a result of their shared ethnicity. They became professionally associated in 1998 when Shere convinced them to open accounts at Ladenburg Thalman so that he could manage their money. Claimants did so and opened several accounts with Shere.

After approximately 2 years of volatile growth for the Claimants at Ladenburg, Shere sought employment opportunities elsewhere and obtained a position with Respondent PSI. Upon information and belief, the overriding basis for PSI extending

an offer of employment to Shere was the understanding that by hiring him PSI would be getting a client with a portfolio value in excess of $23 million. Shere then convinced Claimants to transfer their accounts to PSI with promises of better research, access to highly regarded analysts, better margin interest rates and an overall higher level of client service. Claimant conveyed to Mr. Shere that he did not want to continue the accounts previous volatility of the Ladenburg accounts. He wanted conservative investments of little risk which would generate approximately $500,000 a year from his $22 million in investments. Claimants trusting Shere and believing they would be better served at a larger, nationally renowned Broker Dealer like PSI, signed discretionary authority to the broker for the Nasimang Enterprises and joint accounts and thereafter transferred the accounts.

The issues regarding the PSI accounts began even before the accounts were officially opened. In early January of 2000, Shere went to Claimant Charanjit Sahni with various documents that need to be completed and signed to effect the transfer of assets from Ladenburg to open the PSI accounts. These documents included, but are not limited to, New Account Forms, Margin Agreements, Option Agreements, Discretionary Trading Authorizations, Joint Account Agreement and the like. Shere had Claimants sign all the documents in blank, at a later date he then dated, filled in the pertinent information and gave the documents to PSI to process the transfer and open the accounts. It was at that time that Mr. Sahni conveyed to Mr. Shere and PSI management, that the assets in the accounts being transferred were all the assets of the customer.

As a result, Claimants transferred in four accounts to PSI; a corporate account, a joint account and two UGMA accounts with an aggregate asset value of over $23,000,000. From February 2000 to November 2000, Shere, with the complicity of PSI, wildly traded the accounts, abused the use of margin, over concentrated the accounts in specific positions within the internet sector, failed to diversify the accounts across asset classes, breached all fiduciary duties of care supervisory responsibilities associated with discretion and custodial accounts and exposed the accounts to significant market exposure trading naked short options. Shere's actions coupled with

WEISS 0113

PSI's complete lack of adequate supervision of both the accounts and the broker's activities caused Claimants to lose $22,115,342.00

4) <u>WRONGFUL CONDUCT</u>:

    A) <u>SUITABILITY</u>:

When Claimants' chose to transfer their accounts to PSI, they did so with the understanding that they were moving to a reputable, full-service brokerage firm that would help them to manage and maintain conservatively their accumulated wealth. It is a financial service industry standard that specific investments and or the recommendation to invest must be suitable for the client in light of various factors.

An investment's suitability for a particular investor is determined by the size of the particular investment in proportion to the size of the overall portfolio (i.e. concentration), the asset class the investment comes from in relation to the asset classes of the other investments in the client's overall portfolio (i.e. diversification), the investor's financial wherewithal and prior investment experience, investment objectives the investors ability to withstand the specific level of risk associated with the recommended investment, and the investor's ability to replace the lost funds should the investment fail to perform as indicated.

A brokerage firm and its representatives have an affirmative duty to "know their customer". They must take the time and make the effort to understand what is right and what is wrong for each client. Moreover, they have an affirmative duty to advise the client of those investment decisions that are not in the client's best interest and to prevent the client from making ruinous choices. Brokerage firms are prohibited to sit idly by while a client "commits financial suicide on the premises". Claimants were at all times relying on the experience and expertise of Shere, PSI's supervisory management Sklar and Kennedy and PSI's research analyst Ash Rajan to provide them with the proper guidance and information to safeguard their assets.

However, this suitability requirement was not provided to claimants accounts

because all four accounts, Nasimang Enterprises, Sahni joint account and both the children's custodial accounts were opened through the use of blank signed new account documents, with all the exact same financial information, objectives, investment experience and risk tolerances. At no time did Mr. Shere take the time to review the forms with the claimant or Sklar questioned why four very different accounts maintained the exact same information.

The discrepancies in the new account information from one account document to the next was nothing short of PSI's attempt to satisfy a desired level of trading activity while limiting the firm's potential liability. This is best exhibited in the Ladenburg Thalman 1999 Options New Account Form which states, 5 years options experience, 0 years commodities experience, and 0 years bond experience. Then, less then 2 years later at PSI the Claimants suddenly have 10 years options experience, 10 years commodities experience and 10 years bond experience.

Claimant Nasimang Enterprises transferred in to PSI an account worth $24,156,218. The account had a margin balance of $5,261,195 and was comprised of the following 5 positions:

| Security | Shares | Value $ | Concentration % |
|---|---|---|---|
| At Home Corp. | 354,600 | 13,098,037 | 54 |
| CAIS Internet | 65,000 | 2,405,000 | 10 |
| ETOYS | 80,000 | 1,345,000 | 6 |
| Pricline.com | 102,100 | 5,928,181 | 24 |
| Call PUZ Apr. 40 | 690 | 1,380,000 | 6 |

Clearly this account was entirely over concentrated in Internet-based securities. A review of the remaining three accounts including the UGMA accounts for Claimants' minor children, reveal the very same levels of overconcentration in risky and unsuitable securities. Additionally, a review of the accounts will show that the Nasimang Enterprise account maintained an average of 93% Internet concentrated portfolio of securities throughout the life of the account at PSI and that the size of the positions taken in any particular stock was always monumental. There were never any small

positions, stocks tended on average to be held in $2 million to $5 million-size lots.

There was no effort made to decrease the highly speculative and volatile positions Claimants held in their accounts. Respondent failed at every step to properly diversify and therefore reduce the exposure to the Claimants assets. At no time did Shere make any effort to reduce the size of Claimants holdings in Internet stocks. In fact, the completely unfettered, unsupervised, discretionary trading Shere engaged in during the first 4 months the accounts were open, caused Claimants to further concentrate their holdings in internet securities to almost 100%, assume egregious levels of margin exposure and engage heavily in highly risky naked options trading.

At the same time that Claimants accounts plummeted in value from over $23,000,000 in February 2000 to a combined value of approximately $963,996 in September of 2000, Respondent PSI reaped a windfall of profits from the excessive and abusive trading that was allowed to happen during that same 8-month time-period. PSI earned $164,795 in readily ascertainable commissions and $372,043 in margin interest. These numbers have not yet taken into account the mark-ups, market maker fees and other unknown fees Claimants paid during this time.

Respondent's failure to properly advise and invest Claimants' accounts in suitable and diversified holdings coupled with the exorbitant use of margin and naked options trading caused Claimants to incur the significant losses they now seek restitution for. Respondent failed to follow elementary principles of diversification as required by law and custom.

### B) BREACH OF FIDUCIARY DUTY:

Claimants gave full account discretion to Shere when they executed PSI's Trading Authorization Forms. In any example of discretionary trading, the individual granted the authority assumes the role of a fiduciary to those clients. The acceptance by PSI of the grant of discretion to their financial advisor on his own clients' account raised the bar with respect to the level of fiduciary duty that was owed to Claimants.

WEISS 0116

Shere had a heightened level of responsibility to do the right thing with respect Claimants' accounts because he had been given the authority to make decisions on behalf of those accounts. Upon information and belief, PSI has standards governing the accounts in which trading authorization has been granted. Those standards are heightened further when discretion and naked option writing has been given to the broker on the account. Respondent by and through Sklar's and Kennedy's management and the compliance department, failed to adhere to their owns strict internal supervisory procedures and compliance policies and maintain adequate supervisory procedures and compliance policies to properly supervise and monitor the Claimants' accounts.

A relationship of trust and confidence existed between Claimants and Shere and throughout the course of their dealings, Claimants made clear to PSI and Shere that they were relying on Respondent's expertise in selecting and recommending investments and investment strategies which were well-suited to Claimants' needs, including the need to make safer more prudent and suitable investments so as to conserve their accumulated wealth.

Claimants had been exceptionally fortunate in their relationship with Shere while at Ladenburg and they believed that this established relationship of trust would continue and grow as they moved to PSI with a more conservative investment posture. Pursuant to this, Claimants justifiably relied on Shere and PSI at all times prior to and during the investment recommendations described above. Shere and PSI owed Claimants fiduciary duties of loyalty, honesty, full disclosure and special care. Shere and PSI failed miserably in providing Claimants with the level of care and supervision required of a financial advisor who has trading discretion over his clients' accounts.

### C) FAILURE TO SUPERVISE:

All broker dealers are required to establish compliance guidelines, written supervisory procedures and systems (automated exception reports, surveillance programs and a series of multi-level checks and balances) necessary for the reviewing,

monitoring, supervising and safeguarding customer accounts.

Respondent PSI and its supervisory management had a duty, by and through its branch office management Stuart Sklar and Martin Kennedy and its compliance department to supervise its employees and the activity in its clients' accounts. Upon information and belief, Respondent has very specific requirements with respect to the supervision of accounts and a branch manager's duties to adhere to those requirements. Additionally, standard in the industry is the oversight of account and broker activity by a firm's compliance department. PSI, like every full-service brokerage house, has written compliance manual policies and procedures that are required to be followed. It is patently clear from a review of the churning in Claimants' accounts, the abuse of discretion and excessive use of margin, the naked option exposure, the lack of diversification, the concentration of internet securities, the reckless supervision and accountability of PSI's security analysts, the questionable way in which the account documents were prepared and the signatures guaranteed, the indiscriminate marking of virtually all order tickets as unsolicited after February 2000, that these requirements were completely disregarded.

The level of supervision is clearly defined by the circumstances surrounding the accounts, the clients' investment experience, the type and size of accounts and the relationship between the financial advisor and the client. When trading authorization has been granted to the financial advisor on his client's behalf, that requisite level of supervision is heightened. When naked put option writing is granted in an account whose financial resources have been overextended, that requisite level of supervision is heightened. When UGMA accounts are actively traded on margin in violation of firm policy, that level of supervision is heightened. When the excessive use of margin causes accounts to have multiple house and fed calls on a daily and weekly basis, that level of supervision is heightened. When positions in UGMA accounts are liquidated and large sums of money are withdrawn from those accounts, heightened levels of supervision are required. When accounts decline in value by 90% in a 4-month period of time and the loss is greater than $20 million, heightened supervision is required.

WEISS 0118

When account transfer documents are signed in blank, filled in later and then medallion signature guaranteed afterwards, the level of supervision is heightened.

Had only one of the above-noted issues existed with respect to Claimants' accounts, it could fairly be said that PSI and its supervisory management Sklar and Kennedy failed in their responsibilities to supervise the accounts. The mere fact that all of the above-noted violations occurred and then some, give rise to such a complete and utter lack of supervision on the part of PSI and its management so as to make PSI's conduct reprehensible. PSI by and through it's appointed personnel completely and utterly failed to have adequate, appropriate and sufficient levels of supervision in place to guard against Claimants suffering a loss of $22,115,342.

Additionally, PSI and its management failed to supervise the purchase of hundreds of thousands of shares of L90 Inc. A security which at times, represented 100% of Nasimang Enterprises total net equity. This security was a low priced Internet stock which PSI analysts did not cover, review or approve.

### D) ACCOUNT ACTIVITY:

In addition to the multiple compliance, suitability, supervisory and fiduciary issues described above, PSI and it's employees violated the rules and standards governing: use of margin, both in terms of excessive use and prohibited use in an UGMA account; prohibitions against sharing in profits and losses with clients; excessive trading resulting in accounts being churned; and orchestrating withdrawals from UGMA accounts to cover margin calls in Claimants' corporate account.

A review of the Nasimang Enterprises account reveals that in the 10 months the account was open, it was turned over more than 11 times. This 11 times turnover ratio does not however, take into consideration the $10 million exposure of the naked option positions which would have significantly increased the turnover ratio. This figure includes October and November 2000 when the accounts had little or no net equity. Additionally, it should not be forgotten that the turnover ratio is on an average equity of

WEISS  0119

$4.25 million and an original deposit of approximately $22 million. It takes a lot of trading to turn that size account over that many times in that short a period of time.

During the first four months of activity in the Nasimang Enterprise Account, the account was charged total of $134,225 in commissions. This was an average of $33,556 a month during a period when the accounts equity plummeted from $18,895,023 to $664,521 in 4 months. In review of Nasimang Enterprises margin expense over the 10-month period, the account was charged $325,0000 in interest charges. However, $251,289 was charged over the first four months during a period the accounts net equity declined from $18,895,023 to $664,521.

In review of the Sahni Joint Account in the 8 months the account was open, it was turned over 7.6 times or 11.4 on an annualized basis. The net equity over the first five months went from $2,532,556 to $687,512. These numbers represent a net decline of over 73% during this five-month period. Over the life of the account, the margin interest charged to the account was $59,637. In a period of four months when the Joint Account equity declined from $2,532,556 to $381,689, the margin debt-to-equity ratio increased from 126% to 165%, a 24% increase while the account equity decreased 85%. For management to allow an account debit balance of $1,357,060 on equity of $817000 in an account whose portfolio is over concentrated in Internet stocks and whose equity had just declined from $2,322,954 the prior month was nothing short of reckless.

Upon information and belief, it was the branch management of PSI's office that suggested Claimant Charanjit Sahni liquidate positions in his children's UGMA accounts, take the funds from those accounts and deposit them into a corporate checking account and then use those funds to cover margin calls in the Nasimang Enterprises account.

Respondent PSI engaged in a pattern of sharing Claimants' profits and losses over the life of the accounts. A review of the accounts show that on profitable trades Claimants were charged commissions and the commissions were waived when the

WEISS 0120

trades lost money. These are violations of NYSE and NASD rules and regulations in addition to PSI's own internal policies.

5)   CONCLUSION:

Claimants placed their trust in PSI and Shere when they opened their accounts. They further demonstrated that trust by granting trading authority to Shere. In the months following the opening of the accounts, Shere, PSI and it's management and compliance staff violated that trust and their duties to the Claimants through their egregious conduct. They acted recklessly and indiscriminately, investing Claimants' funds in a pattern of buying nothing but technology and Internet stocks while abusing the use of margin and ignoring proper levels of diversification.

Respondent PSI, are liable for the activities of its employees, Mitesh Shere, Stuart Sklar, Martin Kennedy and Andrea Klein under the legal theory of respondent superior. Mitesh Shere had discretion thereby acting as a fiduciary and breached the duties of care he owed Claimants by investing and recommending unsuitable securities and failing to follow elementary principles of diversification.

Shere controlled the trading in the accounts and engaged in excessive trading thereof for the purpose of generating commissions. Respondent is thus liable to Claimants for churning.

Respondent PSI, Stuart Sklar and Martin Kennedy are also liable to Claimants for their own negligence, for negligent supervision, for breach of contract, and for breach of its fiduciary duty.

WEISS 0121

6) <u>DAMAGES:</u>

The Claimants seek damages of $22,115,342, together with interest, the costs of this proceeding and attorneys fees.

Dated:    Jericho, New York
          April 16, 2002

                                  Respectfully submitted,

                                  Robert Weiss & Associates, P.C.
                                  Counsel for Claimants
                                  50 Jericho Turnpike, Suite 201
                                  Jericho, NY 11753
                                  516-876-4213

WEISS 0122